UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. CR17-265 MJD

| | |
|---|---|
| UNITED STATES OF AMERICA, | **UNDER SEAL** |
| Plaintiff, | **INFORMATION** |
| v. | 18 U.S.C. § 1349 |
| | 18 U.S.C. § 981(a)(1)(C) |
| JULIO ENRIQUE RIVERA, | 28 U.S.C. § 2461(c) |
| Defendant. | |

THE UNITED STATES ATTORNEY CHARGES THAT:

## INTRODUCTION

1. At times relevant to this Information:

    a. Providence Financial Investments, Inc. was a Miami-based company that purported to generate high rates of return for investors by purchasing accounts receivable at a discount in Brazil.

    b. Providence Holdings International, Inc., was a Delaware holding company based in Key Biscayne, Florida. Individual A, Individual B, and others formed Providence Holdings International, Inc., in or about 2008. Defendant RIVERA became a principal of Providence Holdings International, Inc. in or about 2009.

    c. Providence Financial Investments, Inc. and Providence Fixed Income Fund, LLC were subsidiaries of Providence Holdings International, Inc. Individual A, Individual B, and defendant RIVERA formed Providence Financial Investments, Inc. and Providence Fixed Income Fund, LLC (collectively, along with Providence Holdings

SCANNED
OCT 18 2017
U.S. DISTRICT COURT MPLS

United States v. Julio Enrique Rivera

International, Inc., "Providence"), in or about 2009 and 2010 in order to raise money from investors. Defendant RIVERA, Individual A, and Individual B served as Providence's Managing Directors.

    d.  The purchase of accounts receivable at a discount is known as "factoring." Providence's marketing materials explained that in Brazil, consumers write ten separate post-dated checks for $100 – one per month – to pay for $1,000 in retail items such as consumer electronics or groceries. The retailer sells the ten post-dated checks to Providence for approximately $820, and Providence earns $180 over ten months as the checks mature. As a result, Providence claimed to make a 48% annual return on money invested in factoring in Brazil.

    e.  From in or about 2010 until in or about June 2016, Providence raised more than $64 million from investors in the United States. Providence employed a nationwide network of brokers who sold promissory notes to Providence investors. These promissory notes typically carried an annual interest rate between 12% and 24%. Defendant RIVERA, Individual A, and Individual B provided the brokers with Providence marketing materials to show investors that the money they invested would be used to factor accounts receivable in Brazil.

    f.  In reality, instead of using the investors' money to factor accounts receivable in Brazil, and as defendant RIVERA, Individual A, and Individual B knew, Providence personnel diverted a significant amount of the investors' funds by paying purported profits to investors and commissions to brokers, including commissions to defendant RIVERA, with money raised from new investors. In addition, as defendant

2

United States v. Julio Enrique Rivera

RIVERA knew, Individual A and Individual B diverted investor funds to other companies that they controlled.

g. Between in or about 2007 and in or about 2014, Individual A, Individual B, and others formed a host of companies, including an import/export company, a travel company, a credit restoration service, and a catering company and food truck operated by Individual A's wife. As defendant RIVERA knew, Individual A, and Individual B used money raised from Providence investors to fund other companies' operations, despite causing the investors to be told their money would be invested in Brazilian factoring.

h. Infinity Income was a financial advisory firm headquartered in St. Louis Park, Minnesota, and owned and operated by Individual C. Between in or about July 2013 and in or about June 2015, Individual C raised approximately $2.4 million for Providence from Minnesota investors through Infinity Income by representing to investors that Providence would invest their money in factoring in Brazil.

## COUNT 1
(Conspiracy to Commit Mail Fraud)

2. The grand jury hereby re-alleges and incorporates Paragraph 1 as if fully set forth herein.

3. From at least in or about 2010 through at least in or about November 2015, in the State and District of Minnesota and elsewhere, the defendant,

**JULIO ENRIQUE RIVERA,**

United States v. Julio Enrique Rivera

did knowingly conspire with Individual A, Individual B, and others to devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions, and for the purpose of executing such scheme and artifice, and attempting to do so, caused the sending, delivering, and receipt of various matters and things by United States Postal Service and private and commercial interstate carrier.

4.      The purpose of the conspiracy was to enrich defendant RIVERA, Individual A, and Individual B, to solicit and obtain millions of dollars of investors' funds through false and misleading pretenses, representations, and promises, and to conceal from the investors Providence's true financial condition and the manner in which defendant RIVERA and his co-conspirators were using Providence investors' money.

### Defendant RIVERA and his Co-Conspirators Caused Investors to Invest in Providence by Falsely Representing They Would Use the Investors' Money to Invest in Factoring in Brazil

5.      Beginning in or about 2010 and continuing through at least June 2016, Providence raised more than $64 million from investors in the United States in the form of promissory notes with annual interest rates between 12% and 24%. Providence solicited investors through a network of brokers located throughout the United States, including in Minnesota. Defendant RIVERA, Individual A, Individual B, and Providence's brokers told investors that Providence would use the investors' money for factoring receivables in Brazil.

6.      Beginning in or about April 2011, defendant RIVERA participated in drafting and revising an Executive Memorandum for use in soliciting investors for

4

United States v. Julio Enrique Rivera

Providence. The Executive Memorandum stated that Providence would use the investors' funds "for the sole purpose" of making a loan to a Brazilian subsidiary of Providence "which will use the proceeds of the loan to acquire receivables or financial instruments such as post-dated checks and/or Duplicatas in the Brazilian Factoring Market." The Executive Memorandum also contained a section entitled "Understanding How a Low Risk 12% ROI [or, Return on Investment] is Possible," which represented that because of the functioning of the Brazilian banking system, investors could receive a 12% annual rate of return in exchange for a low-risk investment in Providence. Defendant RIVERA provided draft copies of Providence's Executive Memorandum to Individual A and Individual B for approval prior to their use. Defendant RIVERA also provided copies of the Executive Memorandum to potential investors and to Providence's brokers for use in pitching the Providence investment to potential investors.

7.   Defendant RIVERA, Individual A, and Individual B were all aware that the Executive Memorandum contained false representations and material omissions regarding Providence's use of investor funds. Nevertheless, they provided the Executive Memorandum to potential investors and directed that Providence's brokers provide the Executive Memorandum to potential investors. In addition, defendant RIVERA, Individual A, Individual B, and others acting at their direction made verbal misrepresentations to investors and potential investors regarding Providence's use of investors' funds, including falsely representing that the investors' funds would be invested in factoring in Brazil.

8. Providence employed a nationwide network of brokers to solicit investors. None of these brokers were licensed to sell securities. The brokers received a substantial annual commission on the investor funds they raised for Providence. Some of the brokers recruited additional brokers and collected commissions on the investments solicited by those brokers as well. The brokers continued to receive their commissions for as long as the investors kept their money in Providence.

9. Individual C was an insurance salesman who acted as Providence's broker in Minnesota. Individual C induced potential investors to meet with him by holding free "Social Security seminars" through his company, Infinity Income. He invited the seminar attendees to a follow-up appointment, at which time he provided them with the Executive Memorandum and other Providence marketing materials and pitched the Providence investment in factoring in Brazil. Approximately 13 Minnesotans invested a total of at least $2.4 million in Providence after meeting with Individual C and receiving Providence's marketing materials.

10. For the purpose of executing the fraud scheme, defendant RIVERA, Individual A, and Individual B caused Providence employees to use the United States Postal Service and private and commercial interstate carrier to send and receive materials to and from brokers and investors, including investors in Minnesota. For example, during the course of the scheme, Providence employees used the United Parcel Service to send promissory notes executed by Providence personnel, including Individual A, to investors in Minnesota, and to receive back from Minnesota investors fully executed promissory notes.

United States v. Julio Enrique Rivera

**Defendant RIVERA and his Co-Conspirators Used Investors' Money to Pay Other Investors, to Pay Commissions to Brokers, and to Fund Other Companies**

11. Between August 2010 and June 2016, Providence personnel transferred less than $14 million of the $64 million invested in Providence by United States investors to Brazil. Instead, at Individual A's direction, and as defendant RIVERA and Individual B well knew, Providence employees used the investors' funds for other purposes, including:

   a. to make Ponzi-style interest payments and principal redemptions to existing investors;

   b. to pay commissions to Providence's nationwide network of brokers, including commissions paid to defendant RIVERA;

   c. to pay travel expenses for Individual A, Individual B, and other Providence personnel; and

   d. to transfer money to dozens of corporate entities formed by Individual A, Individual B, and others, including an entertainment company, a travel company, an import/export company, a credit rehabilitation company, a realty company, and other limited liability companies.

12. By the end of 2010, defendant RIVERA, Individual A, and Individual B were each aware that Providence had substantial cash flow problems caused by Providence's failure to use investor funds to factor receivables in Brazil as they had represented to investors. Nevertheless, Providence continued to solicit money from investors for use in making these interest and commission payments. In doing so, defendant RIVERA, Individual A, Individual B, and the brokers told investors that their money would be used

7

United States v. Julio Enrique Rivera

to factor receivables in Brazil, and did not disclose that a significant amount of their money would be used to make interest payments to existing investors and to pay commissions to Providence brokers.

### Individual A Lied to Investors to Cover Up the Fraud Scheme

13.     As the Providence promissory notes came due, Providence personnel and the broker who solicited the investments made efforts to induce the investors to roll over the investment into a new promissory note. However, some investors chose to redeem their investments at the conclusion of the term of the promissory note and to withdraw their principal. In order to meet redemptions, Providence needed to raise new investor money. As a result, there would be a delay in repaying the investor's principal.

14.     When investor redemptions were delayed by the need to raise new investor funds, and with the knowledge of defendant RIVERA and Individual B, Individual A lulled the investors into believing that their funds were safe, prevented the discovery of the fraud scheme, and forestalled legal action by the investors by directing Providence personnel to make materially false statements to the investors about the status of their funds. For example, on several occasions beginning in 2011 and continuing through 2015, Individual A and Providence personnel acting at his direction falsely informed investors that delayed redemptions were caused by the need to transfer money from Brazil.

United States v. Julio Enrique Rivera

## Defendant RIVERA Continued to Collect Commissions on Investments He Personally Solicited for Providence through November 2015

15. In or about March 2013, defendant RIVERA resigned from his day-to-day management functions and relinquished his ownership interest in Providence and its related companies.

16. Although defendant RIVERA knew that Providence was not using a significant portion of the investors' funds to factor receivables in Brazil, defendant RIVERA continued to conceal this information from the investors that he had personally solicited for Providence. As a result, instead of withdrawing their money from Providence when their promissory notes came due, defendant RIVERA's investors renewed their investments by purchasing new promissory notes from Providence.

17. From in or about March 2013, when defendant RIVERA resigned from Providence, through in or about November 2015, defendant RIVERA collected more than $200,000 in additional commissions on the funds of investors he personally solicited for Providence.

18. On or about July 28, 2016, Providence Financial Investments, Inc. and Providence Fixed Income Fund LLC declared bankruptcy. In bankruptcy court filings, each entity claimed to have estimated assets between $0 and $50,000. As a result of the fraud scheme, Providence investors in the United States lost more than $64 million.

19. All in violation of Title 18, United States Code, Section 1349.

United States v. Julio Enrique Rivera

## FORFEITURE ALLEGATIONS

Paragraphs 1 through 19 of this Information are incorporated herein by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

As a result of the offense alleged in Count 1, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation of Title 18, United States Code, Section 1349.

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Dated: October 17, 2017

GREGORY G. BROOKER
Acting United States Attorney

*/s/ Kimberly A.*

BY: KIMBERLY A. SVENDSEN
JOSEPH H. THOMPSON
Assistant U.S. Attorneys